The next case this morning is 520-399 People v. Patton. Arguing for the defendant appellant is Sarah Curry. Arguing for the appellee state is Sharon Shanahan. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, ladies. Before we begin, Ms. Curry, you represent the defendant appellant. There was a motion filed by the state to cite additional authority. Did you receive that? I did not. Okay. Well, Ms. Shanahan, we need to make sure that that gets to the defendant. The court is inclined to grant the motion. They want to cite an additional case. Ms. Curry, how much time would you need to review this and respond to it? Do you need more than, say, a week or 10 days? No. Can you tell me what the case is and which argument it pertains to? The case is People v. Wasmund, W-A-S-M-U-N-D. It's 2022, 5th, 190-525. And it deals with statements that are provoked or invited by the defense counsel's argument. I understand that puts you in a difficult position today, but we're going to allow you the opportunity to file supplemental briefing on that. Okay, so is a week enough time? Yes, that's fine. Okay, so the order of the court will be that we grant the motion to cite additional authority. And the defendant will be given 7 business days. To respond to the motion. Okay, with that said, Ms. Curry, you may proceed when you're ready. Thank you, Your Honors. My name is Sarah Curry from the State Appellate Defender, and I represent Lorenzo Patton. I'm going to focus my comments this morning on the issues contained in Arguments 1, 2, and 4, but welcome questions on any of the issues raised in the briefs. Lorenzo Patton was charged with the first-degree murder of Precious Jones and was facing natural life in prison. Yet when defense counsel revealed before trial that he was simultaneously representing Precious's brother and sister, the named victim's brother and sister, the trial court simply glossed over this fact and made no further inquiry into whether Lorenzo's attorney suffered from an actual conflict, a potential conflict, or no conflict at all. A criminal defendant's Sixth Amendment right includes the right to conflict-free representation. When a trial court is sufficiently apprised of even the possibility of a conflict of interest, the court first has an inquiry obligation. The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no conflict at all. When a possible conflict has been entirely ignored, reversal is automatic. Here, defense counsel informed the court that he was simultaneously representing Precious's brother and sister. Defense counsel told the court that he had informed Lorenzo of the representation and that Lorenzo was, quote, okay with it. The court did not investigate the facts and details of defense counsel's representation as is required. The court should have asked what was the nature of the representation of Precious's brother and sister, how long had he represented Precious's sister, whether Precious's brother had assisted in the investigation in any way, whether Precious's brother and sister had assisted the prosecution in any way, and any other questions that would have shed light on defense counsel's representation. Instead, the court asked nothing. Without inquiring further, the court was unable to determine whether there was a personal conflict, an actual conflict, or no conflict at all. Because the trial court failed to conduct the required inquiry, this court should reverse Lorenzo's conviction and remand for a new trial. The state's case against Lorenzo hinged on connecting the television taken from Precious's apartment to Lorenzo and the testimony of Sherita Lennox. However, the most compelling evidence presented at trial was the evidence that Chris Carroll and not Lorenzo shot and killed Precious Jones. Carroll was a suspect from the outset, and he was interviewed by police within a few days of Precious's death. Carroll was dating Precious's daughter, Zanae, and Carroll admitted that he and Precious did not get along. Larry Woodward was able to explain why Carroll and Precious did not get along. While housed in the Marion County Jail with Carroll in September 2018, prior to Precious's murder, Woodward overheard Carroll tell another man that Precious was working for the police and that someone needed to take care of her. Woodward's testimony therefore provided a motive for Carroll to kill Precious. Not only did Carroll have a motive, he had the opportunity. The weekend of Precious's murder, Carroll was furloughed from the Marion County Jail from Thursday through Monday. Precious was killed in the early morning hours of Saturday. While Carroll denied shooting Precious, he did not provide an alibi for where he was at the time of the shooting. And most significantly, Andrew Sloat testified that he met Carroll in 2016 when they were in touch after being released through various drug dealing endeavors. Sometime in 2020, after Lorenzo had been arrested, Carroll told Sloat that he and two of his buddies had killed Precious. Carroll said that when they, Carroll provided Sloat with details about the murder. Carroll said that when they got to Precious's house, a white woman had been leaving. Zanae had testified that Carroll also said that Precious was shot in the living room, which is precisely where Zanae found Precious. The evidence that Carroll was guilty was the person who actually killed Precious creates a reasonable doubt as to Lorenzo's guilt, especially in light of the problematic and unconvincing evidence presented by the state. Charita Lennox's testimony was critical to the state's case, yet her credibility had significant problems. Charita only shared her story with the and the police asked her if she had any information about other offenses that might help her with her own case. This was six months after Precious's murder. Charita had a motive to falsely accuse Lorenzo because he had stolen all of her money and drugs that had gone into business after Precious's murder. Charita's intent to frame Lorenzo is clear from the false statements she provided to police. Charita tried to make it seem that Lorenzo fled Centralia after Precious's wanting to get out of Centralia and back to Charleston on September 22nd, the day of Precious's murder. However, Charita's text messages established that Lorenzo had texted Charita about leaving Centralia on September 19th, two days before Precious's murder. While Charita seemed to know a couple of details about Precious's murder, the evidence presented at trial showed that Precious, Lorenzo, Charita, and all of the witnesses really were involved in a close-knit drug-dealing circle where over the course of six months, Charita could easily have picked up on details of the murder that she could weave into her story. The TV was the other key piece to the state's case, but the evidence presented by the state did not connect the TV that was taken from Precious's apartment to Lorenzo. No one identified the TV that was introduced into evidence as the TV that was in Precious's living room before the murder, including Zanae, who lived at the house, and Alyssa Chapman, who purchased the TV. Chapman told police she was certain the TV she purchased was a 55-inch Samsung, yet the TV introduced into evidence was a 49-inch LG TV. In addition, there was no physical evidence connecting Lorenzo to the murder, and he provided no statements implicating himself and, in fact, testified that he did not kill Precious. Realizing the holes and weaknesses in its case, the state, in rebuttal-closing argument, tried to fill those holes and fortify the weaknesses with improper argument. Jerilyn Gray was possibly the last person to see Precious alive and potentially had information that would have been critical to the case, yet inexplicably did not testify at Lorenzo's trial. In its attempt to clear up Jerilyn's absence for the jury, the prosecutor argued in rebuttal, quote, I anticipate Jerilyn Gray would have said, yeah, I was there, I visited for a while, and I left, end quote. Because Jerilyn did not testify, whatever knowledge she had, critical or not, was not presented to the jury, and for the state to speculate on what her testimony would have been and go so far as to imply that her testimony would not have shed light on what happened to Precious was extremely prejudicial to Lorenzo. As discussed above, Sharita Lennox's testimony was fraught with credibility problems. She was impeached with several prior inconsistent statements that she gave to police. Knowing how important Sharita's testimony was to its case, the state tried to bolster her credibility by arguing, quote, we heard Sharita testify several times yesterday. I neglected to tell you she also testified under oath in front of a grand jury, consistent statements all along, end quote. Defense counsel also implied that Chris Carroll's and really all of the state's witnesses' statements to police were consistent with their trial by telling the jury that these statements to police were turned over to the defense. While the trial court sustained defense counsel's objections to the first two improper arguments, it was too late, and because these arguments were made in rebuttal, the defense did not have an opportunity to respond to them. In a closely balanced case, these improper arguments denied Lorenzo of a fair trial. The evidence presented at trial was insufficient to sustain the state's case with improper rebuttal closing argument. Lorenzo requests that this court reverses conviction, but barring that, he requests that this court reverses conviction and remand for a new trial where the improper argument had the potential for influencing the jury into returning a guilty verdict. Thank you. Justice Moore, any questions? No questions. Justice Vaughn? Just one area, the TV. You said there's no evidence connecting the TV, but isn't the serial number evidence provide a chain of custody from the rental agreement to ultimately being People's Exhibit 5? Yes, the TV from the rental agreement was the TV that was introduced into evidence, but it was not established that the TV from the rental agreement was the TV in Precious's living room, so that leaves a hole there. Wasn't there a testimony about who purchased from who to get it to Precious's residence? Yes, she did testify that she purchased the TV from the woman who was on the rental agreement, but she had told police previously that she thought the TV belonged to Big John and that she thought the TV was hot, and she also said that the TV was a different TV than the type TV that was in the rental agreement, thus causing a hole in the chain. All right, thank you. Okay, Ms. Curry, you'll have a few minutes after Ms. Shanahan's argument. Ms. Shanahan, you ready to proceed? Yes, Your Honor. Go ahead. This is a big record, several issues, not a whole lot of time to address them, and one of the things I try to do in oral argument, in addition to addressing any questions that this court might have, is to figure out what to present to you in this brief time. Many in this court, I suspect, recall Steve Norris, who was deputy director of our agency for many, many years, and Steve told me to consider oral argument to be the state's reply brief. This is our chance to answer any questions that were raised in the reply brief that we haven't had a chance to address before. So, with the court's permission, that will be the primary focus of my oral argument. I would notice that overlying all of this discussion, Ms. Curry's argument and mine, is the acknowledgment that in a case like this, the issues are fact-intensive, and this court will undertake a careful review of all of the record, which cannot possibly be addressed in 10 minutes. Ms. Shanahan, maybe I can direct you in one direction. The concept of interest, there's no allegation of a per se conflict, but certainly there's potential conflict or implied conflict, and it doesn't look like the court made any that when counsel disclosed this potential conflict, it was like 15 months before the trial. He told the trial court, the defense counsel brought this to the court's attention right off the bat, as soon as he was appointed counsel for both people. Doesn't that put an obligation on the trial court to inquire as to the nature, and the trial court asked no questions. He just relied on the defense counsel to say, these aren't witnesses, and as far as we know, they're not involved in the prosecution's case, and left with that. But the court never inquired, never asked the defendant if he had an understanding of those conflicts and what issues it might raise. There was no inquiry whatsoever. There was a little bit of inquiry. He did ask the court if he understood the potential and had any objections to counsel continuing to represent. But I think the important thing is, as I say, the minute he starts on this case, he discloses the fact that these are the brother and sister, and that to his knowledge, neither of them are going to be witnesses in the case. And in Holloway versus Arkansas, the United States Supreme Court noted three important points regarding a defense counsel's beliefs as to whether there's conflict of interest. First, the defense counsel is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial. Second, defense counsel has the obligation, and I think this is very important, upon discovering a conflict of interest to advise the court at once of the problem. And third, again, very important, attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath. So counsel brought this to the court's attention, as I say, 15, 16 months before defendant went to trial. Given the fact that he so promptly brought this to the court's attention, if either of these cases had ever developed to where they were witnesses for the prosecution, assisting the prosecution, obviously defense counsel recognized this and following Holloway versus Arkansas, if any of either of these clients of his had ever reached that conflict status, shall I say, he obviously would have brought it to the court's attention. Now, I believe, and please don't let me misquote you, that you said there was obviously no per se conflict of interest. Well, there was none apparent. I don't want to say obviously, but there was none apparent of record that I saw. Well, but there's only a very few things that can create a per se conflict, and defense kind of tries to shove this into the entity assisting the prosecution. And there is nothing, when you look at defendant's case, neither of these people were ever disclosed as witnesses. Certainly neither one of them testified. In the reply brief, the defendant says something about, well, there was a man there when Daryl Jones brought the TV set back, and maybe that was Sam Jones. So, I mean, that's not assisting the prosecution. That's not being a witness for the prosecution. If he was there, he was there, but that doesn't make him fall under any of the per se conflicts of interest. And as far as an actual conflict, defendant, as I pointed out in my opening brief, had to prove prejudice, and he never did that. He never argued the prejudice prong, and you just cannot take either of these people and fit them into the per se conflict. I mean, they were not, defense counsel did not have a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution. Defendant says, well, we don't know whether they were assisting the prosecution. Well, if they were assisting the prosecution, then the prosecution had a duty under the rules of discovery to disclose this to defense counsel, and there's absolutely nothing to indicate that he did. And as I said, again, following Holloway versus Arkansas, if anything had happened, if it had ever been disclosed, they would have, he would have brought it to the trial court's attention. He did it the first time, he knew he had an obligation, and following Holloway versus Arkansas, he would have disclosed it. Certainly the facts in the case don't even remotely bring in the victim's brother or sister. There had to be something to bring this into the possibility of a conflict before the defense counsel had a duty to bring any further. So, even if it's, even if, I argued that this was a knowledgeable waiver, because at the point that defense counsel first brought it to the court's attention and to the defendant's attention, by the way, we don't know, and defense counsel's under attorney-client confidentiality certainly had no obligation to tell the court what he and defendant talked about, but he did say, I mean, he and the witnesses talked about, but he did disclose it, the record does disclose that he talked to the defendant both times and that he did tell the court that this was a brother of witnesses in the case or involved in the case, and he even makes a comment, and I'm paraphrasing here, that obviously, if anything changed, then he would bring it to the court's attention, and he never did anything else, and as I said, this was all a year and a half before defendant went to trial, so the state's belief that the minor potential for conflict, which defense counsel disclosed 15 months before trial, and the trial court did ask defendant, is that true, do you want to keep, I'm sorry, I forget defense counsel's name, do you want to keep defense counsel, and defendant said both times, yes, and in fact, when they were discussing the brother, he was rather adamant about it, he didn't mind if any of the victim's family was represented by his counsel, and if so, that waiver at that point is sufficient, and it is clear that if this had ever progressed at all, that defense counsel would have said, I found out now that Sam is going to clearly recognize his obligation to do so right from the very beginning, and so there's a waiver, there's a no per se conflict of interest, counsel knew his obligation, and never disclosed anything that would indicate that it got, it rose to the level of a per se conflict, there's not an actual conflict, and defendant doesn't even argue the prejudice problem in his brief. Okay, Ms. Shanahan, Justice Moore, any questions? No. Justice Vaughn? No further questions, thank you. All right, Ms. Curry, you have rebuttal? Thank you, the state ignores completely that the court had a duty to inquire, yes, defense counsel also has a duty to bring any conflict to the court's attention, but the court itself had a duty to inquire. In this case, when defense counsel informed the court that he was representing Precious's brother, and that Lorenzo was, quote, okay with it, all the court said was, is that correct? The court made no inquiry whatsoever, and the interesting thing here is that the state speculates as to, you know, we can talk about whether it's a per se conflict or a potential conflict, the state makes speculations about that, the defense makes speculations about that, because there's nothing in the record to determine what kind of conflict, or if there was a conflict, there's nothing in the record to make that hold Lorenzo. It was the court's duty to make the inquiry, to make sure that Lorenzo knew what the conflict was, what the conflict meant for him, and to determine whether a conflict existed at all. Defense counsel was just appointed to represent Precious's brother when he brought it to the court's attention, he hadn't even spoken to Precious's brother yet, he wasn't even in a position to say that there was no conflict. This required an ongoing inquiry, a further inquiry, there was nothing brought out about these relationships, this representation, what Precious's brother and sister might have contributed to the investigation, they may not have been listed on the discovery as witnesses at trial, but they could have participated in the investigation in a way that could have risen to the level of an actual conflict that Lorenzo had a right to know about, he had a right to be admonished about, and he had right to make a knowing waiver if he so chose. But because there was never an inquiry in the beginning, none of that was fleshed out before trial. If there are no further questions. Justice Moore? No other questions. Justice Bond? No other questions, thank you. All right, Ms. Curry and Ms. Shanahan, thank you both for your arguments today, this matter will be taken under advisement and an order will issue in due course.